Page 20

```
 1      Q.     Yes.  That was my understanding of what they were.

 2   So how many different credit cards do you accept?

 3      A.     All of them, American Express, Discover,

 4   MasterCard, Visa.

 5      Q.     Okay.  Do you do the majority of your business by

 6   credit card?

 7      A.     I would say so.

 8      Q.     Yeah.  At the shows, do you accept credit cards?

 9      A.     Yes.

10      Q.     Do you also do a lot of cash business at the shows?

11      A.     Some.

12      Q.     And do you invoice the cash business as well?

13      A.     Yes.

14      Q.     Okay.  Do you also accept checks?

15      A.     Yes.

16      Q.     Okay.  I would ask you about request No. 6, back to

17   -- excuse me -- back to document No. 1, Exhibit No. 1.

18   You've made a claim that Ms. Symons has engaged in false

19   advertising.  It's on page 7, if you're looking.  I'm sorry.

20   And my request was any documents and things relating or

21   referring to any false advertising.

22      A.     Well, the first letter she sent out to everybody.

23      Q.     And what was that first letter?

24      A.     It was inferring that Bob Berg was out of business.

25   Only the name has changed.
```

```
 1       Q.    Did she say Bob Berg was out of business?

 2       A.    No.

 3       Q.    So you inferred that from reading --

 4       A.    No, I didn't infer it.  The letter did.  The

 5  customers understood it that way.

 6       Q.    Did customers tell you they understood it that way?

 7       A.    Yes.

 8       Q.    Do you have -- did you document the customers who

 9  told you they understood it that way?

10       A.    No.  But we could.

11       Q.    Do you have that letter?

12       A.    Yes.

13       Q.    Did you see that letter among the groups of

14  documents in Exhibit No. 2?

15       A.    This here?

16       Q.    Yes.

17       A.    No.

18       Q.    Have you provided that letter to your attorneys?

19       A.    Yes.

20       Q.    Okay.

21             MS. GOLDSTEIN:  Again, Mark, I would ask that

22  you provide us with that letter, please.

23       Q.    (BY MS. GOLDSTEIN)  Can you think of anything

24  else --

25       A.    Yes.
```

Rough Ascii                                                                          September 9, 2004

1      Q.      -- that you have?  Go ahead.

2      A.      Oh, on November 21, 2000, 249 District Court, Judge

3   Wayne Bridewell warned Ms. Symons about using Bob Berg's name

4   in advertising in a particular magazine called "Super

5   Looper."

6      Q.      Called what?

7      A.      "Super Looper."  And Symons continued to do that

8   for one year later in the same magazine.

9      Q.      Was she -- and I just want to clarify this.  Was

10  she using the name Berg or the name Bob Berg?

11     A.      Berg.

12     Q.      Okay.  Do you have copies of those ads?

13     A.      Yes, ma'am.

14     Q.      Have you provided those ads to your attorney?

15     A.      I don't know.

16     Q.      Take a minute, if you need to, but can you tell me

17  if you saw any of those advertisements in Exhibit 2?

18     A.      I didn't see any.

19     Q.      Okay.

20              MS. GOLDSTEIN:  I ask that, Mark, you look to

21  see if they were provided and provide them to me.

22     Q.      (BY MS. GOLDSTEIN) And, Bob, if you could provide

23  them, if you have not already done so --

24     A.      Yes, ma'am.

25     Q.      -- I would appreciate that.

September 9, 2004

 1        A.     Can I write on this?

 2        Q.     That's the official exhibit.

 3        A.     Let me grab a pen.

 4        Q.     Would you like a piece of paper?  There you go.

 5        A.     Thank you.

 6        Q.     Did the judge issue an order, a written -- anything

 7    in writing that day?

 8        A.     Well, I have the transcripts from the court on what

 9    the ruling was and everything.

10        Q.     Okay.  Have you provided the transcripts to your

11    attorney?

12        A.     I really can't remember, but I can --

13        Q.     Okay.

14        A.     -- and I will.

15        Q.     Okay.  I would appreciate that.  Request No. 7 is

16    probably one we already spoke about.  In Plaintiff's Original

17    Complaint, you make the allegation that Berg first began such

18    activity in the late nineteen seventies, and that is

19    referring to the Berg elements.  So I asked you before if you

20    had pictures or advertisements or pamphlets.

21               This request is just a little more broad, if

22    you have any other documents that would describe or picture

23    or in any way back up the statement that you began making

24    this jewelry in the early nineteen seventies.

25        A.     Okay.

1      Q.      Do you think that you might have any documents that

2    would fit this category?

3      A.      Possibly.

4      Q.      Okay.  Like everything else, if you can find

5    anything, I would certainly appreciate it.  Do you have

6    drawings that you made of some of your earlier works?

7      A.      All that stuff from 20 years ago, even the stuff

8    that's two years old gets boxed and stored away.

9      Q.      Okay.

10     A.      It's pretty hard to look back 20 years and then --

11   especially when you move to another country.

12     Q.      Do you have -- when did you stop making the Indian

13   jewelry?

14     A.      The what?

15     Q.      The Indian jewelry.

16     A.      Oh, about '75, '76.

17     Q.      Do you have any pieces of it left?

18     A.      My mother has got a piece.

19     Q.      Does it show some of these elements?

20     A.      Well, it's a bear claw, black background.

21     Q.      But it doesn't have the --

22     A.      No.  It's a different style.

23     Q.      -- Bob Berg look --

24     A.      No, it's a different style.

25     Q.      -- so to speak.  Your mom doesn't have any of your

Rough Ascii                                                        September 9, 2004

1    early pieces with the Bob Berg elements?

2         A.    No.  Let me elaborate on that.  I experimented on

3    different pieces throughout the years.  So it was a slow

4    process.

5         Q.    When do you believe you created the earliest pieces

6    that contain all of the Bob Berg elements, as they are called

7    in your complaint in this lawsuit?

8         A.    All of the elements?

9         Q.    Uh-huh.

10        A.    It's hard to say.

11        Q.    Well, let me ask you this.  Do you think a piece

12   infringes your copyrights if it doesn't have all of the

13   elements?

14        A.    No.

15        Q.    Okay.

16        A.    Depends on the look.

17        Q.    Well, I think you testified that having a black

18   background in and of itself would not infringe your

19   copyright.

20        A.    Correct.

21        Q.    That's been done for a long time.

22        A.    Correct.

23        Q.    And the vine and leaf scroll work in and of itself

24   would not infringe your copyright, because that's been done

25   for a long time.

1      A.    Correct.

2      Q.    So the vine and leaf scroll work with the black

3   background, you feel like that would infringe your copyright?

4      A.    No.

5      Q.    Okay.  So --

6              MR. TIDWELL:  Can you clarify that you're not

7   talking about tri-colored gold or layered, vine and leaf

8   scroll work.

9              MS. GOLDSTEIN:  Right.  I haven't talked

10   about the gold yet.

11     Q.    (BY MS. GOLDSTEIN)  Do you believe if a piece has

12   tri-colored gold -- I know you said you don't know of anybody

13   who's doing tri-colored gold before you.  Do you believe if a

14   piece has tri-colored, but not necessarily the black

15   background or the tapered beads, would that infringe your

16   copyright?

17     A.    No, I don't believe so.

18     Q.    Let me ask you, what do you think a piece would

19   need to have the Bob Berg look, which elements?

20     A.    All three elements.

21     Q.    I think we mentioned four.  So which elements?

22     A.    Four?  All of them together.

23     Q.    Well, could you tell me specifically which ones?

24     A.    The tapered round beads, black background, the

25   tri-colored gold, three dimensionally stacked three high, and

Rough Ascii                                                    September 9, 2004

                                                                     Page 27

 1    black background.

 2        Q.    Okay.  So do you remember when you made the

 3    earliest piece that had all of those elements together?

 4        A.    No.

 5        Q.    Can you give an approximation?

 6        A.    Like I said, it was over a period of time.  The

 7    piece I mentioned earlier was in '81.  I did different pieces

 8    using the different elements, but not all together over that

 9    period of time.

10        Q.    Do you remember which order you started adding

11    different elements?

12        A.    No.

13        Q.    Okay.  So do you believe as we sit here today, that

14    that piece in '81 is probably the earliest that you can, you

15    know, date a piece at this time with those elements?

16        A.    It's the only photo of a piece that contains those

17    elements that are --

18        Q.    Can you think of any significant pieces that we

19    might still be able to find before that time?  For example, I

20    know you've made some big trophy cups that I'm sure are

21    collector's items that people would still have 10 years

22    later, 20 years later.  Can you think of a particular piece

23    that you could go back that would date it earlier than '81?

24        A.    I can't think of any right now.  I can think of

25    some after, one in particular.

Page 28

1      Q.     Okay.  Then I think it's probably very important

2    that we find that picture from 1981.  The sooner you can find

3    that, the better.  I would very much appreciate it.

4      A.     There has been one other person that I made a

5    buckle for, and he got killed in a -- in a car wreck last

6    year.  And I've been trying to contact his -- his wife to get

7    a copy of the picture.  And that buckle's made in around '84,

8    '85, something like that.

9      Q.     Who was that for?

10     A.     Keith Sutton, S-u-t-t-o-n.

11     Q.     Okay.  Thank you.  I know you provided us with one

12   article that discusses your jewelry.  I think we spoke about

13   it yesterday.  It was attached to the complaint.

14            Do you have anything else that would support

15   the statement that Berg's trade dress has become uniquely

16   associated with and, hence, identifies Berg --

17     A.     Yes, ma'am.

18     Q.     -- which was in the original complaint?

19     A.     Yes.

20     Q.     Are there articles or -- well, let me ask you, what

21   do you believe you have?

22     A.     Well, thousands of customers for the last 10 years.

23     Q.     Do you have documents -- I'm guessing that's going

24   to be hard to document unless you have a customer list.

25     A.     Would be very easy to document.

1      Q.     Would it?

2      A.     Yeah.  Just all the customers since then.  It would

3  be all -- I've done that style ever since I come to the

4  United States.

5      Q.     Do you have any other articles that talk about your

6  design?

7      A.     Yeah, possibly.

8      Q.     Okay.  Anything else that you have that would

9  support that statement, we would appreciate.

10              MR. TIDWELL:  But you're not asking him to go

11  create documents from customers.

12              MS. GOLDSTEIN:  No.  No.  Anything that he

13  has.

14      Q.     (BY MS. GOLDSTEIN)  Yeah.  I'm not asking in any of

15  this for you to create documents, other than if that's the

16  easiest way for you to deal with the financial records, I

17  suppose.  But, no.  Anything I'm asking for is documents that

18  you already have in your possession.

19      A.     Okay.

20      Q.     And I think the same would be applicable to any

21  sort of national recognition.  I don't know if your designs

22  have won any awards or -- anything that would, I think,

23  support the statement that your jewelry is unique and you

24  have established a unique trade dress.

25      A.     Was that a question?

September 9, 2004

Page 30

1          Q.      No, not really.  I apologize.  It wasn't very well

2     asked.

3          A.      All right.

4          Q.      The other -- request No. 17 goes to the subject of

5     how the company is set up, which is something I'm still not

6     sure that we ever were able to get straight yesterday,

7     because it sounded like you weren't sure yourself.

8                  But if you can find documents -- do you

9     believe you have documents that would show whether it's a

10    sole proprietorship or a partnership or a corporation, how it

11    operates in the United States?

12         A.      In what period, ma'am?

13         Q.      Do you believe it's changed?

14         A.      Can we get the first --

15         Q.      Well, I'm asking, do you believe that the company

16    was -- has changed from how it was originally set up?

17         A.      I can't really answer that, because yesterday I

18    told you I didn't really know how they -- how they set it up

19    in the beginning.  But I know how they're supposed to set it

20    up.

21         Q.      Okay.  Well, supposed to set it up doesn't matter

22    legally.  How it actually is set up is what, you know --

23    unfortunately, if it wasn't done correctly, that is probably

24    between you and your attorneys.  But, you know, how it

25    actually is set up is pertinent to --

1          A.     I'll get whatever documents that I can find.

2          Q.     -- the lawsuit.  I'd appreciate that.  This would

3    be a good time to take a couple minutes break, if you'd like,

4    and we can move on.  Would you like a break, or do you want

5    to just keep going?  We can just keep going, if you'd like.

6                 I'm not sure whether this has anything else

7    that I need to introduce or not, so give me a quick second to

8    look.  We may have hit it all.  Let's just take a break for a

9    couple minutes so I can see where I want to go here, and then

10   I can save everybody's time.

11         A.     All right.

12         Q.     Thank you.

13                (Brief recess.)

14         Q.     (BY MS. GOLDSTEIN)  Are you ready, Bob?

15         A.     Yes, ma'am.

16         Q.     Okay.  Do you know a gentleman by the name of Hugh

17   Weaver?

18         A.     Yes, ma'am.

19         Q.     What is your relationship with Mr. Weaver?

20         A.     He come to work for us in Australia for a time

21   period.

22         Q.     How did you come to know him?

23         A.     I think I met him in California, Clovis.

24         Q.     Do you remember if you were introduced by somebody?

25         A.     No, I don't.  I think I might have asked somebody

# GOLDSTEIN & FAUCETT

L.L.P.

*Attorneys at Law*

EDWARD W GOLDSTEIN
CHRISTOPHER M. FAUCETT
———
JASON W. DEATS
JODY M. GOLDSTEIN
KATHERINE L SUNSTROM
CORBY R. VOWELL
JASON A. SAUNDERS

1177 WEST LOOP SOUTH
SUITE 400
HOUSTON, TEXAS 77027

TELEPHONE (713) 877-1515
FACSIMILE (713) 877-1737
E-MAIL: FIRM@GFIPLAW.COM

August 13, 2004

*VIA FACSIMILE*

Linda Parrish
1401 McKinney St.
Suite 1900
Houston, TX. 77010

Re: *Berg v. Symons, et. al.* C.A. H-03-2683

Dear Ms. Parrish,

In light of the Court's clear holding that Ms. Symons is entitled to one half the proceeds of any copyrighted designs created by Mr. Berg during their marriage, we expect a full accounting of all sales proceeds by August 31, 2004.

As you are aware, we have received no income or sales documents despite requests for such. Specifically, Request No. 4 in Defendant's First Set of Document Requests asked for all documents relating or referring to Mr. Berg's income and/or sales from Bob Berg Buckles and/or Silverdales. Mr. Berg indicated in his responses of March 31, 2004 that he "is gathering documents responsive to this request and will supplement this response at a later date."

We have repeatedly asked for document production and the documents we have gotten have been woefully inadequate. Your client has had more than enough time to gather these documents and we will be filing a motion to compel if we do not receive them by the end of this month.

You should also be aware that if Mr. Berg proceeds with a claim of trade dress infringement based on a trade dress established during the marriage of Berg and Symons, Ms. Symons will ask the Court to award her one half of the proceeds that Mr. Berg has realized from the sale of all jewelry, buckles and trophies Mr. Berg claims are protected by that trade dress, not just from the proceeds of copyrights or designs created during the marriage.

## GOLDSTEIN & FAUCETT, L.L.P.

Please respond promptly to let us know if we will be getting these documents and others responsive to both sets of document requests.

Very truly yours,

GOLDSTEIN & FAUCETT, L.L.P.

Jody M. Goldstein

Cc:     Edward W. Goldstein (firm)
        Mark Wisner

```
*************************************************************************************
*                          TRANSACTION REPORT                                      *
*                         _____              AUG-13-2004 FRI 02:02 PM *
*                                                                                   *
* DATE  START    RECEIVER        TX TIME  PAGES TYPE       NOTE               M#  DP *
*-------------------------------------------------------------------------------    *
* AUG-13 02:01 PM 7137524221        28"      3   SEND       OK                418    *
*-------------------------------------------------------------------------------    *
*                                                                                   *
*                                         TOTAL :       28S  PAGES:   3             *
*                                                                                   *
*************************************************************************************
```

## GOLDSTEIN & FAUCETT
L.L.P.
Attorneys at Law

1177 WEST LOOP SOUTH, SUITE 400
HOUSTON, TEXAS 77027
713/877-1515
713/877-1737 (FACSIMILE)

## FACSIMILE COVER SHEET

**DATE:**               August 13, 2004

**TO:**                 Linda Parrish

**FACSIMILE:**          (713) 752-4221

**FROM:**               Delores D. Malone

**PAGES TO FOLLOW:**  2

**MESSAGE:**