# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT P. BERG d/b/a BOB BERG BUCKLES d/b/a SILVERDALES, | § § § | |
| Plaintiff, | § § | |
| v. | § | CIVIL ACTION NO. 03-2683 |
| | § § | |
| JOANNE SYMONS d/b/a HY O SILVER, *et al.*, | § § § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION SETTING OUT FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case involves the intellectual property rights to certain western jewelry designs.

The parties, formerly husband and wife, worked together selling western jewelry, prize cups,

and belt buckles during their marriage and became competitors following their divorce.

Robert Berg d/b/a Bob Berg Buckles d/b/a Silverdales ("Berg") sued Joanne Symons d/b/a

Hy O Silver, *et al.* ("Symons") for copyright infringement, trade dress infringement, and

unfair competition.  Symons counterclaimed for tortious interference with business

relationships.  Symons concedes that she copied certain copyrighted designs of Berg's, but

asserts that she is either a co-owner or licensee of the copyrights and trade dress or, in the

alternative, that the copyrights are invalid for lack of originality and for misstatements in the

copyright applications.  Symons also agrees that the jewelry pieces she designed that were

not covered by Berg's copyrights looked very similar to Berg's pieces. Symons argues that Berg has not established a protectible trade dress in the design of the western jewelry they both want to produce and sell.

This court held a bench trial on the parties' claims and defenses. Based on the pleadings, the motions and responses, the evidence, the arguments of counsel, and the applicable law, this court enters findings of fact and conclusions of law. In summary, this court finds and concludes that Berg's copyrights are valid and that Symons is liable to Berg for copyright infringement as to certain jewelry and belt buckle designs. Symons is enjoined from continuing to sell those infringing designs and must pay statutory damages in the amount of $80,000. This court finds and concludes that Berg has not established a protectible trade dress and is not entitled to damages for and an injunction from trade dress infringement. This court denies relief on the counterclaim for tortious interference. The findings of fact and conclusions of law that support these results are set out in detail below.

## FINDINGS OF FACT

### I.  Background

In July 2003, Berg filed this suit alleging copyright infringement, trade dress infringement, unfair competition, and trade dress dilution. Berg sought damages and an injunction to prevent Symons from using his copyrighted jewelry and buckle designs and from copying the  trade dress he asserts. Symons  asserts co-ownership in the copyrights, claiming that the right to sell pieces using the designs copyrighted during the marriage and containing elements that Berg claimed as his trade dress was community property that was

not divided during the divorce proceedings.  Symons also asserts that the copyrights were invalid and the trade dress was not protectible.   In August 2004, this court denied Symons's motion for summary judgment on the co-ownership defense with respect to the copyrights. Because disputed issues of material fact precluded summary judgment on the copyright and trade dress issues, this court held a bench trial on all the claims and defenses.[1]  Both Berg and Symons testified and presented evidence about the design of, and market for, western jewelry, the copyrighted designs, and their claims of superior right to sell jewelry using the designs and design elements at issue.

### A.    Bob Berg Buckles, Hy O Silver, and the Divorce Decree

Berg and Symons, both natives of Australia, married in 1984 and divorced in 2000. Before their marriage, Berg was a rodeo performer and a silversmith.  In the late 1970s, Berg began designing and selling western jewelry.  In 1980, Berg  registered the company name "Silverdales" to sell western jewelry and clothing.  In 1982, after an injury ended his rodeo career, Berg expanded his jewelry business.  Although he focused on belt buckles, he also began to design, produce, and sell western-style rings, necklaces, bracelets, conchos, spurs, knives, and three-piece buckle sets.

Berg met Symons in 1983 when she was appearing at rodeos as Miss Rodeo Australia. At that time, Berg produced jewelry himself.  As his jewelry business grew, Berg traveled to the United States to attend jewelry shows and recruit American engravers and silversmiths

---

[1] The joint proposed pretrial order stipulated that the trial would be to the court.  (Docket Entry No. 62, p. 9).

to work as independent contractors, making jewelry and buckles in Australia. Several engravers and silversmiths came to Australia to work with Berg. Hugh Weaver, an accomplished silversmith and engraver from Wyoming who testified at trial on behalf of Symons, worked as an independent contractor for Berg for six months in 1990. (Bench Trial Tr., Feb. 23, 2005, p. 21). Weaver credibly testified at trial that he showed Berg design features that Berg later incorporated into his own belt buckle and jewelry designs, including the use of tapered raised beads on a raised edge.

In 1993, Berg and Symons moved to Bandera, Texas, to pursue the western jewelry market in the United States. Symons helped run the office, which was located next to the couple's house. They advertised and sold the jewelry and buckles using the names "Bob Berg Silverdales" and "Bob Berg Buckles." They hired independent contractors to sell the jewelry and buckles at trade shows and rodeos. Although some sales were made on the Internet, the couple primarily marketed the jewelry and buckles through direct sales at shows held in conjunction with rodeos and through contracts with rodeo associations. Calls and correspondence related to sales were directed to the Bandera office telephone number and post office box address. The Bandera office would fax orders and design specifications to a production factory in Guadalajara, Mexico, which was run by Cesar Navia. Berg trained Navia to use certain molds, dyes, and engraving and silversmith techniques in manufacturing the jewelry and buckles. (P. Ex. 26, pp. 92–96).

Between October 1992 and June 1996, Berg registered four copyrights for western jewelry designs in his name: VA-530-294, VA-547-192, VA-292-803, and VA-817-815.

(Docket Entry No. 17, pp. 1–2). The molds used to make the jewelry contained the copyrighted designs. Since the divorce, Berg has registered two additional copyrights, VA-1-091-617 and VA-1-159-548. Each of the copyrights covered a number of specific pieces of jewelry, belt buckles, and similar items.

Berg testified that in addition to copyrights of specific designs, his jewelry and buckles have a distinctive "look" that consists of the following elements: black background, the use of "tri-color" (red, green, and yellow) gold; a layer of scrollwork with a vine design, a layer of leaves, and a third layer of flowers; and, when edged, use of a raised silver edge with large tapered beads. Berg testified that the presence of a colored stone in the middle of the flowers is not a distinctive element of his work. He also agreed that not all his pieces use an edge. Berg was not the first to use a black background, more than one color gold, or vine and leaf scrollwork, or to place beads on the edge of a buckle or piece of jewelry. Berg contended, however, that the combination of these pieces was distinctive and had become uniquely associated with the "Bob Berg look." At the same time, Berg testified that if a piece of jewelry or buckle did not have a black background, it would not infringe his asserted trade dress.

The Berg-Symons jewelry business was successful. In 2000, Berg designed the trophy cup for the world championship professional bull riding competition. In an advertisement displaying the trophy cup, Berg and his work were described as follows:

> A distinctive craftsman of Western buckles and jewelry, Australian native Bob Berg has separated his art from others in the Western market with his revolutionary techniques and

singular designs. Cowboy, artist, and entrepreneur, Berg, who hangs his hat in Bandera, Texas, was asked to create an updated version of the Bud Light Cup trophy to honor PBR world champions in the coming years. Knowledge, experience and artistic energy inspired Berg's work on both the new cup and the 2000 world championship buckle.

. . .

Berg was sidelined from rodeo shortly after his arrival in the United States in 1971, yet capitalized on the down time by expanding his interest in engraving and silver-work. The trademark gold-and-silver-on-black style for which he is now famous evolved from this early sideline interest.

. . .

Berg has built championship buckles for prominent rodeo committees across the United States and supplied buckles to the champions of the Australian Pro Rodeo Association for the past 22 years. Hand-cut and soldered scrollwork and lettering characterize Bob Berg designs. Berg initiated the technique of stacking tri-color gold to achieve a three-dimensional look in his buckles and jewelry.

(P. Ex. 53, pp. 70–71).

At trial, Symons testified that when she first met Berg, his work was indistinguishable from "standard" western jewelry produced by all the major rodeo or western belt buckle designers and sellers, such as Gary Gist and Skyline Silversmiths. She described the design elements of Berg's early work as "fairly standard in the industry," which included "a berry edge or a rope edge," gold overlays, an engraved silver background, and colored stones set into the overlays. "A berry edge is the same size all the way around of half-round beaded wire." (Bench Trial Tr., p. 4). Symons testified that Berg changed his style after meeting Hugh Weaver. In March 1990, Weaver came to Australia to work with Berg as an independent contractor, doing design and engraving work, for six months. (*Id.* p. 22).

Symons and Weaver testified that Weaver created the edge made up of beads with different sizes tapered from large to small beads and showed it to Berg. Although the copyright for one of the jewelry collections includes drawings of edge designs consisting of tapered beads of various sizes on blank buckles, (Trophy Blank Cast Two, BB1249), Berg stipulated at trial that he was not asserting copyright protection for the tapered beaded edge design contained in the drawings.

With respect to the trade dress, Symons identified two Weaver pieces that she claimed contained all the elements that Bob Berg claimed as his distinctive trade dress, including the tapered beads on the edge of the buckles and jewelry pieces. Symons identified the Cheyenne Buckle, a copyrighted design, as containing all the elements that Berg asserts as the protected trade dress. (D. Ex. 41). Weaver credibly testified that Berg neither originated nor monopolized the elements Berg identified as his distinctive trade dress. Weaver testified that in 1989, he showed Berg a trophy buckle he designed that included the elements Berg asserts as his trade dress. Weaver testified that, although he was the first to incorporate heavy or oversized beaded edges into three-piece buckle sets, he did not continue to use the beaded edge design in his work. Weaver identified other western jewelry designers who originated and continued to use these design elements. Mark Grain, an engraver, pioneered the use of heavy, oversized, different sized beads on the edge of pieces of western jewelry and buckles. Weaver testified that heavy, graduated beads elevated traditional edge work in western jewelry design and had become a widely used feature in western jewelry. Symons and Weaver testified that the use of round, graduated beads on edges of western jewelry is

common, as is the use of a black background. Vine and leaf scrollwork is also a common

element in western jewelry. The use of tri-colored gold is less common; Weaver testified

that it is "industry standard" to use two colors for belt buckles, but that tri-color gold has

been used in jewelry pieces for many years. In short, according to both Symons and Weaver,

Berg claimed trade dress based on design elements that are often used in the western jewelry

industry.

In the fall of 1998, Berg and Symons separated. Berg moved out of the couple's home

in Bandera and bought a house in Cleburne, Texas. The business continued to operate out

of the Bandera office and Symons continued to live at the Bandera property. Lyn Liss, who

worked as the office manger before the divorce, continued to take orders for jewelry and

buckles and manage the business from the Bandera office.

In 1999, Berg and Symons filed for divorce in the 249th District Court in Johnson

County, Texas. During the divorce proceedings, Symons and Berg signed three agreements:

a Rule 11 Agreement[2] dated October 19, 1999; a Mediated Settlement Agreement dated

February 11, 2000; and a Final Divorce Decree on March 3, 2000. Symons established Hy

O' Silver to sell western jewelry and buckles in competition with Berg. The Johnson County

court appointed Mike Bowles as the receiver of all the inventory. (P. Ex. 23). The inventory

---

[2] Texas Rules of Civil Procedure require that all agreements between parties or attorneys in a suit be contained in a written agreement. TEX. R. CIV. P. 11. Written settlement agreements, often called "rule 11 agreements," are enforceable as contracts. *See Penton v. Am. Bankers Ins. Co.*, No. 04-20013, 2004 U.S. App. LEXIS 23499 (5th Cir. Nov. 10, 2004) (unpublished opinion); *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256 (5th Cir. 1995). The Rule 11 Agreement between Berg and Symons provided a temporary settlement of matters pending trial. (Rule 11 Agreement, D. Ex. 6).

consisted of unsold jewelry and buckles and the castings used to make certain jewelry,

buckles, and trophy designs. The unsold items and the casting pieces included belt buckles,

earrings, bracelets, rings, necklaces, and conchos. The Rule 11 Agreement stated in part as

follows:

> All existing inventories of the manufacturing business are to be delivered to Mike Bowles as an accountant serving as temporary receiver. Each party will be allowed to sign out various items of inventory for the purpose of sale with all of the net revenue received from the sales to be delivered weekly to the accountant.
> . . .
> Bob Berg may check out inventory from accountant to take to shows and Joanne Berg, although not permitted to go to shows, may check out inventory for the purpose of sale . . . . She is allowed to handle the daily telephone calls relating to the Bandera office.
> . . .
> The accountant will be provided information by the parties necessary to account for orders taken at shows for delivery up to and including January 31, 2000.
>
> It is understood that each party is permitted to enter into sales agreements providing for delivery subsequent to February 1, 2000. Joanne Berg's transactions are not to be made under the names of Bob Berg and/or Silverdale. Each party agrees that orders taken under this paragraph are the separate property of the party taking the order.

(*Id.*).[3]

---

[3] Both parties accuse the other of diverting sales money and jewelry from Bowles. In October 1999, Symons obtained a restraining order that prohibited Berg from visiting the Bandera property, including the office. Symons stayed at Berg's house in Cleburne, Texas on her way to a jewelry show in Glen Rose, Texas. Berg was out of town, and Symons, who did not have a key to Berg's house in Cleburne, obtained a key from the real estate agent. Symons testified that she took completed inventory, a jewelry case, and a booth from the house. (P. Ex. 26, pp. 168–70).

Symons testified that under the Rule 11 Agreement, she was to continue to work in the Bandera office of "Bob Berg Buckles," answering the telephone as "Bob Berg Buckles," but could take orders for custom-made products that would not be ready for delivery until after February 1, 2000 (the projected date of the divorce) in the name of Hy O Silver. Those products would be made in the Bob Berg Buckles factory in Mexico with material and molds owned by Bob Berg Buckles. Symons used the same production factory as Bob Berg Buckles to produce the items ordered, but stamped these products with the Hy O Silver label. If Berg took an order for such products, he would be allowed to place those orders in the name of Bob Berg Buckles. This arrangement lasted until February 11, 2000, when the Mediated Settlement Agreement was signed. During the period of the Rule 11 Agreement, Symons obtained jewelry directly from Cesar Navia and began to sell jewelry at trade shows and rodeos. Symons used the Bob Berg Buckles name to register for booths at the shows. In some instances, this prohibited independent contractors who regularly sold Bob Berg jewelry from obtaining booth spaces. Symons began to advertise using the business name Hy O Silver. In advertising, she used the name Symons-Berg, the toll-free numbers and P.O. Boxes at the Bandera office that had been in use since 1993, and described herself as formerly associated with Bob Berg Buckles. Under the Rule 11 Agreement, the receiver controlled the business that came in through the Bandera office. Liss continued to manage the office as she had before the divorce. Symons continued to work in the Bandera office,

answering the phone as "Bob Berg Buckles."[4]

On November 1, 1999, Symons sent a letter to customers of Bob Berg Buckles to inform them of her new business, Hy O Silver.   Berg argues that the letter led people to believe that Bob Berg Buckles was out of business or was going out of business.  The letter states:

> I am sending this letter to you as a form of introduction.  My name is Joanne Symons-Berg, I have been in the buckle and jewelry design business for 16 years.  Formally I had been associated with Bob Berg Buckles.  My new company is **Hy O Silver** of Bandera, Texas. . . .
>
> The product offered by Bob Berg Buckles for individuals, rodeo committees, youth groups, private ropings, etc. will remain the same.  The quality of the product workmanship will not change and as Hy O Silver we will be adding new items to the line.
>
> We at Hy O Silver have been at this location for 5 years and the staff of the past 2 years is remaining the same!  We know that you have ordered from us in the past and would like to offer you a 25% discount on a new order from you if delivered after January 31 and a 10% discount on any committee order.
>
> I am aware that it is difficult for all of when changes occur and we would like to assure you that only the name has changed. . . .

(P. Ex. 38).    The letter was signed by Joanne Symons-Berg, proprietor, and Lyn Liss, general sales manager.

Symons testified that she completed two sales under the name of Hy O Silver for

---

[4] In state court, Symons testified that during the Rule 11 negotiations, she and Berg had  agreed that she would not "work shows" or sell jewelry, but would stay home with the children and help run the Bandera office, which would continue to operate as "Bob Berg Buckles."

buckles to be delivered after February 1, 2000. Before the divorce, Berg had contracted with the same two rodeo associations and designed the buckles for them. In 1997, Berg had submitted a bid to the Reno Rodeo Association. In 1999, Hy O Silver completed this contract, using the same buckle design. Symons faxed the order to the Mexico factory for the manufacture of the Reno Rodeo buckles. (P. Ex. 26, pp. 171–73, 178). In 1999, Hy O Silver also completed an order under a contract that Berg had negotiated with the Texas High School Rodeo Association ("THSRA") in 1997. THSRA had agreed to purchase prize buckles for three years at a price of $275.00 per buckle. (P. Ex. 39). The record contains a letter from the treasurer of the THSRA explaining the transaction with Hy O Silver:

> I called the phone [number] I had from the invoice in our files, which I knew was in Bandera. I don't remember how the phone was answered but I explained [that the THSRA had overpaid Bob Berg Buckles for a previous buckle order]. [Lyn Liss] explained to me right up front that the Bergs were in the middle of a divorce and that Mr. Berg was in the Dallas area still making buckles, Mrs. Berg had taken over the business in Bandera. . . . [Liss told me that] it might take some time to get the money refunded, however, Mrs. Berg's company now called Hi-O-Silver [sic] would honor the $275.00 price as well as give the [THSRA] the credit from the overpayment. I didn't ask for Mr. Berg's phone number nor was it offered.
>
> It was explained to me that the same craftspeople and designers worked in Bandera as before and that the buckles would look exactly like the Bob Berg Buckles we had previously purchased with the exception of the name of the back . . . . We placed our order and were very pleased with the end product. Looking at the buckles you can't tell any difference from one year to the next.

(P. Ex. 39).

The Mediated Settlement Agreement executed in February 2000 did not mention Hy

O Silver.  It required Symons to turn over Bob Berg Buckles's business records and customer lists within twenty days.[5]  The Mediated Settlement Agreement did state that Symons would have the right to sell "all business inventory in her possession or subject to her control and all inventories in the possession of" the temporary receiver.

The Divorce Decree executed in March 2000 awarded Berg:

> [t]he business known as Bob Berg Buckles, including but not limited to all fixtures, inventory, cash, receivables, accounts, goods, and supplies; and all rights of privileges, past, present, or future, arising out of or in connection with the operation of the business.

(P. Ex. 25 ¶ 9).  Berg received the same rights in the business known as "Silverdales."  A similar clause awarded Symons rights in "Hy O Silver":

> The business known as Hy O Silver, including but not limited to all furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, and supplies; all personal property used in connection with the operation of the business; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business.

(*Id.*).  Symons also received "[a]ll inventory in the possession of Michael Bowles, Receiver," which included the unsold inventory of Bob Berg Buckles.  (*Id.* ¶ 10).  Symons testified that she asked her lawyers to add the provision giving her Hy O Silver after the parties had signed the Mediated Settlement Agreement, which did not refer to that entity.

---

[5]  Symons testified that she used the records of Bob Berg Buckles to create the mailing list for advertising materials for Hy O Silver, including the November 1, 1999 letter.  A former employee of Bob Berg Buckles had created a customer list and saved it on the hard drive of the computer in the Bandera office, but the computer crashed and the list was apparently lost.  Symons testified that the she took the old computer to Perry Holt, a student who does computer work on the side, and traded it for a new computer. (P. Ex. 26, pp. 194–95).

Symons was allowed to sell the unsold inventory of Bob Berg Buckles in the receiver's possession, including inventory covered by Berg's copyrights and the trade dress he asserts. It took her approximately a year to sell the unsold inventory, which had a value of approximately $200,000. The Divorce Decree did not mention "copyrights," but was intended as final distribution of all property.

In November 2000, Berg filed a motion in the 249th District Court for Johnson County, Texas, for a preliminary injunction to enjoin Symons from using the P.O. Box and phone number at the Bandera office to advertise or sell under the Hy O Silver name, from advertising Hy O Silver as a new name of Bob Berg Buckles, and from redirecting customers who visited the Bob Berg Buckles website to the Hy O Silver website. *Berg v. Berg*, C20000346 (Tex. Dist. Ct.-249th Nov. 13, 2000). Berg also asked the court to order Symons to return business assets from the Bandera office, including molds, dies, and business records. (P. Ex 26, p. 91). Symons's counsel argued that the phone number and address were "accessories or accouterments" to the real estate that Symons received in the divorce, and that enjoining Symons would allow Berg to reap the benefits of Hy O Silver's advertising efforts. (*Id.*, pp. 207–08, 211).

The evidence presented to the state court showed that Liss had used domain names to redirect customers visiting the Bob Berg Buckles and Silverdales websites to the Hy O Silver website. (P. Ex. 118). Symons testified at the November 13, 2000 injunction hearing that Liss had done so without her knowledge. (P. Ex. 26, pp. 123–24). The evidence presented to the state court also showed that in August 2000, Wrangler hosted the 2000 Bud

Light Texas Team Roping Champion Finals in Fort Worth, Texas. The program describing the events and the prizes listed prize buckles made by "HY O SILVER (formerly Bob Berg) Buckles." (P. Ex. 57). Symons testified in the injunction hearing that she had sent a promotional letter to Bud Light offering to provide prize buckles made by Hy O Silver "formerly *of* Bob Berg Buckles" and that the omitted "of" was a typo. (P. Ex. 26, p. 135). The state court enjoined Symons from using the Bob Berg Buckles name, allowed her to advertise with Berg's personal name in hyphenated form only, and cautioned her to be careful in the words she chose for advertising. (*Id.*, pp. 217–19). Symons was not enjoined from manufacturing and selling either Berg's copyrighted designs or new designs that used what he asserts to be his trade dress.

Symons testified in her deposition and at the bench trial that she initially hired Cesar Navia to produce the jewelry she sold through Hy O Silver. (P. Ex. 146, p. 70). Symons has used the same jewelry producers that Berg uses since she started Hy O Silver. (*Id.*, pp. 70–71). Berg asserts that Symons had "stolen" equipment, castings, and employees. Berg submitted a copy of a March 2004 letter that he sent the FBI, alleging unlawful pirating and counterfeiting by Symons in Mexico. Symons acknowledges that she used the same production facility but argues that no legal impediment limited her ability or right to do so.

Symons testified at trial that, while under the Rule 11 Agreement, she sold Bob Berg designs under the Hy O Silver name, and that after the divorce, she continued to sell some of Berg's copyrighted designs. She testified that after her divorce, she began making more of her own designs, but still uses the same design elements that Berg asserts as his protected

trade dress.  Symons and Berg are selling to the same market. Both sell at rodeo shows, sell contracts to rodeo associations, and use the Internet to sell jewelry and belt buckles.

**B.     The Parties' Claims and Defenses**

At trial, Symons stipulated to selling specific jewelry designs that Berg had copyrighted.  Symons asserts that she had an implied license to produce and sell the designs at issue.  The implied license to continue making the jewelry designs is based on the divorce agreements she and Berg executed.   Symons relies on the fact that under the Rule 11 Agreement, she had the right to sell jewelry during the divorce proceedings, and that under the Divorce Decree, she had the rights to Hy O Silver.  Symons asserts that the parties intended the divorce to divide Bob Berg Buckles, and that Hy O Silver would continue to sell the same products that Bob Berg Buckles sold.  Berg responds that Symons and Hy O Silver were granted only the right to sell the unsold inventory of Bob Berg Buckles for a limited time.

Symons also asserts that the copyrights were invalid, based on errors and omissions in the copyright applications.  In her posttrial brief, Symons concedes that the errors are primarily clerical.  She  maintains, however,  that the copyrights are invalid because Berg did not disclose that Weaver had contributed to the designs, so they were not Berg's original work.  (P. Ex. 5, '815 Copyright, p. 1249).

As to the trade dress claim, Symons argues that Berg's asserted trade dress is not protected under the Lanham Act.  Symons testified that although Berg uses and combines identical elements and some people have recognized a piece as a "Bob Berg" piece, (Bench

Trial Tr., p. 5), there are a number of western and rodeo jewelry designs that use the same elements and have a similar appearance. Symons argues that Berg cannot show distinctiveness. Berg presented magazine articles that describe his pieces as innovative and presented witnesses—Lorainne Owen and Michelle Lillie—who testified that they associate the asserted trade dress elements as Bob Berg's signature look.

## III. The Copyright Claims

### A. The Applicable Legal Standards

To prove copyright infringement, the plaintiff must show ownership of a valid copyright, and actionable copying. *Galinao v. Harrah's Operating Co., Inc.*, 416 F.3d 411, 414 (5th Cir. 2005). To prove actionable copying, "a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 374 (5th Cir. 2004) (quoting *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997)). "Copyright ownership is shown by (1) proof of originality and copyrightability and (2) compliance with the applicable statutory requirements." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 407 (5th Cir. 2004).

The originality requirement "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Norma Ribbon & Trimming Inc. v. Little*, 34 U.S.P.Q.2d 1603, 1604 (5th Cir. 1995) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991)). "A certificate of registration, if timely obtained, is prima facie evidence both

that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004). The presumption that a certificate of registration creates is rebuttable. *Norma Ribbon*, 34 U.S.P.Q.2d at 1604 (citing *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 n.10 (5th Cir. 1991)). Section 410 of the Copyright Act requires that a court presume a copyright is valid if registered within five years of the work's first publication. If the copyright is registered after the five-year period, the court may give as much weight to the copyright registration as it desires. 17 U.S.C.A. § 410. If a copyright has been infringed, the owner may elect to recover either actual damages or statutory damages. Under 17 U.S.C.A. § 504(c)(1), statutory damages for nonwillful infringement can range from no less than $750 to no more than $30,000 for each infringed work. The Fifth Circuit has determined that in cases involving multiple infringements and multiple infringed works, "the total number of 'awards' of statutory damages . . . that a plaintiff may recover in any given action depends on the number of *works* that are infringed . . . regardless of the number of *infringements* of those works." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir.1992) (emphasis in original).

If willful infringement is found, the court may raise the statutory damage award up to $150,000 for each infringed work. 17 U.S.C. § 504(c)(2). *See* H.R. Rep. No. 94-1476, at 162, *reprinted in* 1976 U.S.C.C.A.N. 5659, 5778 ("The basic principle underlying [§ 504(c)(2) ] is that the courts should be given discretion to increase statutory damages in cases of willful infringement and to lower the minimum where the infringer is innocent."); *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113-14 (2d Cir. 2001) ("[S]tatutory damages are not

meant to be merely compensatory or restitutionary. The statutory award is also meant 'to discourage wrongful conduct.' That is why the statute permits consideration of . . . additional damages where an infringement is willful.") (quoting *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d. Cir. 1992)).

To prove willful infringement, "the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights." *Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) (citing *In re Aimster Copyright Litigation*, 334 F.3d 643, 650 (7th Cir. 2003); *Lipton v. Nature Co.,* 71 F.3d 464, 472 (2d Cir.1995); *N.A.S. Import Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir.1992)); *see also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 112 (2d Cir. 2001) ("Willfulness in this context means that the defendant recklessly disregarded the possibility that its conduct represented infringement.").

### B. Analysis

The copyrights at issue are VA-530-294 (belt buckles), VA-547-192 (seven sculptures for belt buckles), VA-292-803 (design on a straw hat), and VA-817-815 (jewelry designs), which Berg registered during the marriage, and VA-1-091-617 (belt buckles, bracelets, and other jewelry) and VA-1-159-548 (belt buckles, hat crown, necklace, conchos, saddle plates, barrettes, cuffs, and bracelets), which are derivative copyrights registered after the marriage. At trial, Symons stipulated to having manufactured and offered for sale one product, product number 3406, a trophy blank cast, registered under VA-817-815 and 39 products registered

under VA-1-091-617.  She also admitted that she might have made two additional products registered under VA-1-091-617.  The stipulated products include link bracelets, cuff bracelets, three-piece buckles, buckle tips and keepers, conchos, earrings, knives, money clips, pendants, rings, and watch bands.

Symons first argues that there should be no statutory presumption of validity under section 410 of the Copyright Act, because she has shown evidence that Berg created these works at least five years before registration.  The critical date is not when Berg created the works, but when he published them.  According to each of the copyrights, the date of publication, the date when Berg made the works available for sale, is in the same year as the date of registration.  See 17 U.S.C.A. § 101 (defining "publication" as "the distribution of copies . . . of a work to the public by sale. . . .").  The evidence did not show that the items were offered for sale five years before they were registered.  This argument does not defeat the statutory presumption of validity.  *See Id.* § 410.

Symons also challenges originality.  Symons argues that Berg's designs lack originality because they copied elements from Hugh Weaver's works.  In a related argument, Symons asserts that the copyrights are invalid because Berg's applications to the Copyright Office were fraudulent because they failed to identify Weaver as an author and failed to designate the designs as derivative works.[6]

---

[6] Symons also argued at trial that the copyright registration nos. VA 530-294 and VA 547-192 are not authenticated and therefore inadmissible. However, this court admitted the '294 copyright at trial. Furthermore, since this court does not award damages for infringement of the '294 or '192 copyrights, Symons's argument regarding authentication is moot.

In his testimony, Weaver did not claim authorship or co-authorship of any of Berg's copyrighted works. Indeed, Weaver freely admitted that he took no part in creating any of the drawings or designs submitted in any of Berg's copyright applications. Weaver also testified that his work consisted primarily of three-piece buckle sets, not the wider range of jewelry products that Berg also offered. Weaver credibly testified that he developed his trophy buckle with many of what Berg claims as the "Bob Berg elements" and showed them to Berg. Many of these elements, however, are common in western jewelry. For example, Weaver testified that he was not the first to use round beads on the edge of western jewelry and buckle designs.

Although Symons argues that Berg has copied a general "look" that Weaver had previously established or design ideas that Weaver had previously formulated, she presents no evidence that any of Berg's specific copyrighted designs copied any of Weaver's specific designs. There is no evidence that Berg's copyrighted designs copy any protected expression by Weaver. Indeed, at trial, Weaver admitted that Berg offers a wide variety of products that Weaver has never designed or produced, such as rings, bracelets, and earrings. Berg's copyrighted designs for specific pieces of jewelry did not copy Weaver's designs, although the evidence showed that Berg used design features that Weaver also used, and which appear in other western-style jewelry and buckles.

Using design features that previously appeared in other works does not negate the originality required for copyright protection of a work. "[I]t is now clearly established, both as a matter of congressional intent and judicial construction, that the originality necessary to

support a copyright merely calls for independent creation, not novelty. Thus, a work will not be denied copyright protection simply because it is substantially similar to a work previously produced by others, and hence, is not novel." 1 NIMMER ON COPYRIGHT § 2.01[A] (2005). The record shows that Berg's copyrighted designs were independent creations that meet the requirement of "originality" for the purpose of copyright protection. Berg's failure to disclose Weaver's contribution to the copyrighted designs does not invalidate the copyrights. Under the Copyright Act, two or more authors of a protected work must intend that their contributions "be merged into inseparable or interdependent parts of a unitary whole" in order to be "joint" or "co-" authors. 17 U.S.C.A. § 101. *See also Childress v. Taylor*, 945 F.2d 500, 508 (2d Cir. 1991) (the parties must "entertain in their minds the concept of joint authorship"). Weaver testified that he does not claim authorship of any of Berg's copyrighted works. Weaver's testimony also indicates that he did not intend to be a co-author of any of Berg's designs. The record does not provide a sufficient basis to invalidate the copyrights because of Berg's failure to list Weaver as a co-author.

Symons's argument of copyright invalidity based on the allegedly "derivative" nature of Berg's designs is also unpersuasive. Courts have established that a work must borrow substantially from the *expression* of ideas, not the ideas themselves, to be considered "derivative." *See Reyher v. Children's Television Workshop*, 533 F.2d 87 (2d Cir. 1976) (it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression); *Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("'[A] copyright owner can't prove infringement by pointing to features of his work

that are found in the defendant's work as well but that are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another'") (quoting *Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923, 929 (7th Cir.2003)). A work is "derivative" only if it infringes the underlying protected work by borrowing from it without its author's permission. *See Dam Things from Denmark v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 563 n.22, 565 (3d Cir. 2002); *Harris Custom Builders, Inc. v. Hoffmeyer*, 92 F.3d 517, 521 (7th Cir. 1996). Berg's designs are not derivatives of Weaver's work. This court finds that Berg's products satisfy the relatively low requirement of originality under the Copyright Act. *See Norma Ribbon*, 34 U.S.P.Q.2d at1604. Berg's use of design elements from Weaver's 1986 buckle in designing new, different jewelry items and buckles does not require Berg to designate those items and buckles as derivative works on his copyright registrations.

Courts may find a registration invalid if the copyright claimant willfully misstated or failed to state a fact that, if known, might have caused the Copyright Office to reject the copyright application. NIMMER § 7:20[B]. The record does not show that Berg intended to defraud the Copyright Office by failing to identify Weaver as a source of the design elements in the copyright applications. *See Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140 (9th Cir. 2003) (holding that table lamp assembled from preexisting components was either compilation or derivative work, but designer's failure to identify designers or source of components in its copyright application did not render resulting copyright registration invalid absent showing that such failure was made with intent to defraud the Copyright

Office); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821 (11th Cir. 1982) (holding that plaintiff's copyright in a soft sculpture doll was not unenforceable because of fraud on the copyright office, despite plaintiff's failure to list his coauthor and to complete item on copyright application headed "Compilation or Derivative Work," when such omissions were not intentional or purposeful concealment of relevant information); *Donald Frederick Evans and Assocs., Inc. v. Cont'l Homes, Inc.*, 785 F.2d 897 (11th Cir. 1986) (without proof that omission of preexisting work on copyright registration application was intentional or purposeful, claim that copyright was invalid due to substantial similarity of copyrighted drawings with preexisting work would fail).[7]

Symons has stipulated to copying Berg's work and has not overcome the presumption that Berg's registered copyrights are valid. *See Gen. Universal Sys.*, 379 F.3d at 141.

## C.    The Affirmative Defenses

This court ruled on August 11, 2004, that Symons is not a co-owner of the copyrights that were obtained during the marriage. (Docket Entry No. 33).[8] Symons now asserts that

---

[7] Berg acknowledged that the first five pages from the '815 registration, which show buckle blanks with beaded edges, were removed from consideration in the copyright infringement part of this case. Berg does, however, continue to assert that the designs of those buckles are protected trade dress. He testified that these pages were intended to be filed in a trademark registration, not a copyright registration.

[8] After the opinion was issued, Symons argued that she was entitled to an offset of any damages award because she was entitled to future profits from the copyrights. In response, Berg filed a motion to clarify that the statement in the opinion about Symons's right to economic benefits derived from the copyrighted works does not apply to future earnings. A spouse is only entitled to division of property that the community owns at time of the divorce. *Loaiza v. Loaiza*, 130 S.W.3d 894, 908 (Tex.App.-Fort Worth 2004). In *Butler v. Butler*, the court held that the wife was not entitled to an award of half the husband's future earnings from his psychological counseling business after the divorce. 975 S.W.2d 765, 768 (Tex.App.-Corpus Christi 1998, no pet.). The court awarded half of the fixtures, furniture, inventory, and all personal property associated with the husband's sole proprietorship to the wife as community property in the divorce. *Id.* The court held that the husband's future income, which would be derived from the husband's business after the divorce, was not property acquired during marriage. *Id.*

she had a license to use the copyrighted designs. Symons argues that she received an implied license to sell Berg's copyrighted designs in the Rule 11 Agreement entered in 1999, which stated in part that all the jewelry and buckles produced in the Mexico facility were to be shipped to the Receiver. If Berg made sales providing for delivery after February 1, 2000, those sales were his separate property. If Symons made sales providing for delivery after that date, those sales were her separate property. Symons also relies on the provision in the Mediated Settlement Agreement that she was allowed to sell all inventory in the Receiver's possession, and on the provision in the Divorce Decree that awarded her all the rights of Hy O Silver, including its "past privileges." Symons testified that she understood that Hy O Silver would continue to sell the same products that she was allowed to sell under the Mediated Settlement and Rule 11 Agreements. Symons asserts that the divorce would essentially divide Bob Berg Buckles between Berg and Symons, with each allowed to continue to sell the same products that had previously been sold only by Bob Berg Buckles and Silverdales.

Berg argues that Hy O Silver only had the right to sell the existing unsold inventory of Bob Berg Buckles in the receiver's possession and that there was no implied license to continue to make and sell Berg's copyrighted jewelry and buckle designs. Berg argues that such a license would be contrary to the express terms of the Divorce Decree. At trial, Berg testified that he had no intention of splitting the business with Symons; rather, Symons was to take the bulk of the marital estate, and he was to have exclusive control of the business.

Symons has the burden of proving that an implied nonexclusive license was created.

A nonexclusive license may be granted expressly or through the conduct of the parties. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 451 n.5 (5th Cir. 2003). The Fifth Circuit uses a three-part test to determine whether a copyright holder has granted a nonexclusive license. *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872 (5th Cir. 1997). An implied, nonexclusive license arises when:

> (1) the licensee requests the creation of a work;
>
> (2) the creator makes the particular work and delivers it to the licensee who requested it; and
>
> (3) the licensor intends that the licensee copy and distribute the work without his participation.

128 F.3d at 879 (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996); *Effects Assocs. v. Cohen*, 908 F.2d 555, 558–59 (9th Cir. 1990)); *see also Campbell v. Smythe*, 273 F.3d 1107, 1107 (5th Cir. 2001) (unpublished opinion). The "totality of the parties' conduct" determines whether the copyright holder intended to grant an implied, nonexclusive license. *Lulirama*, 128 F.3d at 879.[9] Absent any consideration, an implied license is revoked when the plaintiff files an infringement suit. *See, e.g.*, *Carson v. Dynegy, Inc.*, 344 F.3d 446, 452 (5th Cir. 2003); *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir. 1988).

   At trial, Symons testified that she believed that she had the right to "step into the shoes of Bob Berg Buckles" after the divorce. She points to the fact that she was allowed to sell unsold inventory in the Receiver's possession, which included "blanks" to produce

---

[9] "When the totality of the parties' conduct indicates an intent to grant such permission, the result is a legal nonexclusive license." 3 NIMMER § 10.03[A][7] at 10-41.

copyrighted pieces, and to take orders for new inventory in the name of Hy O Silver that would be ready for delivery after February 1, 2000 and fill those orders using jewelry made from the copyrighted designs in the same Mexico factory Berg used. She relies on the language in the Divorce Decree awarding her the business known as Hy O Silver, including "all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business."

The Rule 11 Agreement did not mention Hy O Silver or the acquisition of new inventory. Hy O Silver was created after the Rule 11 Agreement was executed and the receivership had been set up. (P. Ex. 26, p. 54). The Mediated Settlement Agreement executed in February 2000 did not mention Hy O Silver. That Agreement required Symons to turn business records for Bob Berg Buckles and customer lists over to Berg within twenty days. (Docket Entry No. 17, Ex. B). The award of these business assets to Berg undermines Symons's argument that the parties intended to "split" Bob Berg Buckles.

Any rights that Symons had under the Rule 11 Agreement ended when the parties signed the Divorce Decree in March 2000. It is undisputed that under the Divorce Decree, Symons had the right to sell approximately $200,000.00 worth of jewelry and buckle blanks from unsold inventory of Bob Berg Buckles in the possession of the Receiver. The inventory did contain copyrighted materials, but giving copyrighted materials to another is only one factor in determining whether there is an implied license.[10] Within a year after the divorce,

[10] Section 202 of the Copyright Act states the general principle that ownership of a copyright is distinct from ownership of a material object:

Ownership of a copyright, or of any of the exclusive rights under a

the inventory Symons was awarded had been sold. Symons's reliance on the inventory award is insufficient to show an implied license to make and sell new pieces using Berg's copyrighted designs.

Berg did not create the designs at Symons's request. When Berg obtained the copyrights, he intended that the works would be sold through Bob Berg Buckles or Silverdales, not Hy O Silver. Berg did not deliver the copyrighted designs directly to Symons; the delivery that Symons invokes as the basis for an implied license resulted from the effect of the divorce documents including the creation of a receiver to handle unsold inventory. Courts have recognized the attenuating effect of a third-party delivery. If the alleged infringer did not obtain the works directly from the plaintiff, delivery or acquisition of the copyright does not readily support mutual intent. *See John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26 (1st Cir. 2003) (defendant acquired copies in foreclosure sale not from voluntary transaction with plaintiff). Any income from selling the inventory created during the marriage was community property subject to equitable division.[11] The fact that Symons received the right to sell the unsold inventory existing in

---

copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy . . . in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object.

17 U.S.C.A. § 202. *See,* e.g., *U.S. v. Smith*, 686 F.2d 234 (5th Cir. 1982) (a copyright is independent of both its physical manifestation and the very thing that is copyrighted).

[11] Under Texas law, the general rule of property division is "equitable division." V.T.C.A., Family Code § 7.001. "In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."

1999 and 2000 does not support the conclusion that Symons was awarded the right to create and sell new pieces using Berg's copyrighted designs. The fact that the unsold inventory included some blanks does not suggest that the parties intended that Symons would be able to complete the blanks with Berg's copyrighted designs on a permanent basis, without limitation.

The clause in the Divorce Decree awarding Berg the rights to Bob Berg Buckles is broad and unambiguous:

> The business known as Bob Berg Buckles, including but not limited to all fixtures, inventory, cash, receivables, accounts, goods, and supplies; and all rights and privileges, past, present, and future, arising out of or in connection with the operation of the business.

(Docket Entry No. 17, Ex. B). Even though the Divorce Decree did not mention "copyrights" or trade dress rights, the award of intangible "rights and privileges" of the business to Berg is significant. Berg owned the copyrights. Bob Berg Buckles and Silverdales had exclusive ownership and use of the copyrights before the divorce. The Agreement awarded this right to Berg. The Agreement's reference to "rights and privileges" covered the "subject matter" of the alleged implied license.

The Divorce Decree superceded the Rule 11 Agreement. The Decree awarded Berg all the "rights and privileges" of Bob Berg and Silverdales. The Texas Supreme Court has held that "where there exists a valid express contract covering the subject matter, there can be no implied contract." *Woodard v. Sw States, Inc.*, 384 S.W.2d 674 (Tex. 1964). The Divorce Decree's award of "rights and privileges" to Berg and the fact that the parties

intended to make a final distribution of all property shows an intent that Berg would exercise exclusive control over the intellectual property of Bob Berg Buckles. *See Schiller & Schimdt, Inc. v. Nordisco Corp.,* 969 F.2d 410 (7th Cir. 1992) (buyer of a photography studio acquired seller's copyrights when sale agreement did not use the word "copyright" but indicated that seller sold *all assets of studio, tangible and intangible*). Berg did not provide an implied license to Symons to use Berg's copyrighted designs after the unsold inventory had been exhausted.

### D. Damages

The Copyright Act allows plaintiffs to elect either statutory or actual damages. It provides:

(a) In general. Except as otherwise provided by this title, an infringer of copyright is liable for either—

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

(b) Actual damages and profits. The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

(c) Statutory damages.

(1) Except as provided by clause (2) of this of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and

> profits, an award of statutory damages for all infringements involved in the action, . . ., in a sum of not less than $ 750 or more than $ 30,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

17 U.S.C. § 504(a)–(c)(1). A plaintiff may affirmatively elect statutory damages, but they are in lieu of actual damages rather than in addition to them. "[T]he copyright owner may elect to recover statutory damages, instead of actual damages and defendant's profits. He may, moreover, make such an election regardless of the adequacy of the evidence offered as to his actual damages and the amount of defendant's profits, and even if he has intentionally declined to offer such evidence, although it was available." 4 NIMMER § 14.04[A]; *see also Estate of Vane v. The Fair, Inc.*, 849 F.2d 186, 187–88 (5th Cir. 1988) ("In a copyright infringement action, the infringer is liable for either statutory damages or the copyright owner's actual damages together with any additional profits of the infringer that are attributable to the infringement.").

Berg presented no information as to his lost sales during discovery and was unable to present evidence as to his actual damages on that basis. Symons argues that Berg cannot recover any actual damages because he has failed to establish what part of Symons's gross revenues are directly attributable to her infringement of Berg's copyrighted designs. To support her argument, Symons cites a Second Circuit case holding that any "gross revenue" that a plaintiff can prove must be "reasonably related" to the infringement. (Docket Entry No. 94). *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001).[12] The

---

[12] Symons claims that the Fifth Circuit has followed *Davis* in *Sefton v. Webbworld, Inc.*, No. 00-0042, WL 21406292 (N.D. Tex. Apr. 16, 2003). As the citation of this case indicates, *Sefton* is an

infringement and the gross revenues at issue in this case are clearly distinguishable from the infringement and gross revenues presented in *Davis*. In *Davis*, an eyewear designer sued The Gap, Inc. for using a photograph of a model wearing one of his products in an advertising campaign for Gap stores. He requested actual damages and provided figures of the gross revenues of the Gap's corporate parent, which owned a number of retail stores besides Gap "label" stores. The Second Circuit required the designer to establish The Gap's gross revenues specifically from Gap "label" stores, because this figure would be more reasonably related to the infringement that the designer claimed. The court analogized the designer's attempt to use The Gap, Inc.'s total gross revenues from all of its retail businesses to a poet's attempt to use the gross revenues from a book publisher's entire line of books when the poet's infringed work appeared only in a single anthology of poems. *Id*. at 160.

In this case, unlike *The Gap*, the infringement is not of advertising to generate sales of other products. Rather, the allegedly infringing products used are sold directly. Any profits that Symons derives from selling those products are directly attributable to her acts of copyright infringement. Symons stipulated that she has produced and sold jewelry pieces that use forty infringing designs. The Fifth Circuit has held that, "in establishing the infringer's profits, the copyright owner need prove only the infringer's gross revenues, while the infringer must prove his deductible expenses and must show which elements of profits are attributable to sources other than the copyrighted work." *Vane*, 849 F.2d at 188.

---

unpublished district court case from the Northern District of Texas, not a Fifth Circuit case. Moreover, like the poet analogy in *Davis*, *Sefton* involves a plaintiff whose infringed work constituted only a small fraction of products sold by the defendant. The current case involves a plaintiff whose infringed work constitutes a significant fraction of products sold by the defendant.

In *Vane*, the court nonetheless held that the copyright owner failed to provide the district court with enough evidence for an award of actual damages because the records "were not detailed enough to show the amount received from the sales of particular items [advertised by the infringing works]." *Id.* Although it is not Berg's burden to demonstrate the actual profits Symons earned from infringing his copyright, he has not offered sufficient evidence of Symons' gross revenues for all of her products during the relevant periods. Any award of actual damages by this court would require undue speculation as to the amounts of revenue Symons received and the proportion of the gross revenue attributable to the sale of those products that infringed Berg's copyrights. Such speculation is forbidden in making an award of actual damages for copyright infringement. *Id.* at 187 (affirming court's refusal to award actual damages for infringement where "the evidence was too speculative to support such an award."). In the absence of sufficient proof of actual damages, courts have held that a trial court has discretion to set damages within statutory limits. *Int'l Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir. 1988); *Morley Music Co. v. Dick Stacey's Plaza Motel, Inc.*, 725 F.2d 1, 3 (1st Cir. 1983); *Fermata Int'l Melodies, Inc. v. Champions Golf Club, Inc.*, 712 F. Supp. 1257, 1263 (S.D. Tex. 1989).

Symons argues that, for the purpose of determining statutory damages, compilations and derivative works constitute only one work. As a result, she argues that this court should find that she infringed only two works because the '617 and '815 copyrights are derivative works. Berg responds that any statutory damages assessed against Symons for infringement

should be multiplied by the number of infringing products that Symons sells on her website because each product represents an individual, original work. (Docket Entry No. 96, p. 5).

Statutory damages are appropriately assessed for each work that Symons has stipulated to infringing.[13] Section 408(c) of the Copyright Act allows the Register of Copyrights to authorize "a single registration for a group of related works." 17 U.S.C.A. § 408(c). *See also* NIMMER § 7:20. The two copyrights covered a large number of related but separate works. Although at least thirty-nine of the designs that Symons has manufactured and sold fall under one copyright (VA-1-091-617), they are separate designs for a wide variety of products, from buckles to jewelry to money clips. Each infringed design is an independent and distinct "work" under section 504(c)(1) that has its own "separate economic value." *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990) (discussing what constitutes a "work" under § 504(c)); *see also Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1117–18 (1st Cir. 1993) (although four television episodes fell under one copyright, each episode was produced separately and therefore constituted an independent "work"); *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 768 (11th Cir. 1996) (holding that to constitute a protected "work" under section 504(c)(1), an expression must have an independent economic value and be, in itself, viable and that independently produced

---

[13] Symons stipulates that the product identified on her website as product #3406 infringes Berg's copyright VA-817-815. Symons stipulates that products #2003, #2004, #2005, #2042, #2502, #2603, #2604, #4002, #4003, #4004, #4019, #4020, #4506, #4509, #4510, #4511, #4519, #4521, #4535, #5503, #5501, #6002, #6004, #6005, #6006, #6008, #6503, #6504, #6505, #6506, #6509, #6510, #7001, #7004, #7010, #7505, #7501, #7502, and #7503 infringe copyright VA-1-091-617.

34

episodes of a television series do not constitute a "collection" or "compilation," but are separately infringed "works").

The Fifth Circuit has held that, in cases involving multiple infringements and multiple infringed works, "the total number of 'awards' of statutory damages . . . that a plaintiff may recover in any given action depends on the number of *works* that are infringed . . . regardless of the number of *infringements* of those works." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143 (5th Cir.1992) (emphasis in original); *see also Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 193–94 (1st Cir. 2004) (damages awarded for two infringed songs, despite the fact that the infringer had wrongfully included the two songs on sixteen different albums); *Walt Disney Co. v. Powell,* 897 F.2d 565, 569 (D.C. Cir.1990) (Mickey and Minnie Mouse each count as one "work" for purposes of § 504(c)(1); therefore, damages awarded for one infringement each of Mickey and Minnie Mouse, rather than for multiple infringements of Mickey and Minnie in various poses).  In *Mason*, a cartographer sued a real estate data indexing company for infringing his copyrighted maps by reprinting the maps without permission. Although the cartographer argued that the court should award him damages for each infringing publication, the court awarded damages for each copyrighted map that had been infringed.  This court considers each product design Symons copied to be a separate "work" under section 504(c)(1).   Damages are assessed for each separate design she copied, although not for the number of copies sold of each infringing design.

Symons further argues that any damages assessed against her should be on the lower end of the statutory range because she believed that she had a license to produce the

copyrighted designs and is not a willful infringer. (Docket Entry No. 94, p. 10). Berg asserts that, given the fact that he has sued Symons several times for using his designs, Symons's infringement was willful. This court finds that Symons is not a willful infringer because the legal documents that divided the couple's assets and rights provided some basis for her belief that she was able to continue to use the copyrighted designs that Berg had developed during their marriage, including the fact that Berg gave the Receiver inventory that included molds and blanks, and then gave Symons the right to sell the inventory in the Receiver's possession. Although this case is not the first time that Berg has pursued legal action against Symons for using his designs for business, the record reveals that repetitive legal actions are consistent with Berg's harassment of Symons.

This court assesses damages against Symons in the amount of $2,000 for each infringed copyrighted work.

## III.    Trade Dress

### A.    The Applicable Legal Standards

"Trade dress" refers to the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 (1992); *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1071 n.3 (11th Cir. 2003); *Sunbeam Prod. v. West Bend Co.*, 123 F.3d 246, 251 n.3 (5th Cir. 1997), *rev'd in non-pertinent part by Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351 (5th Cir. 2002). Section 1125(a) of the Lanham Act prohibits a party from "passing off" its goods or services as those

of a competitor by employing substantially similar trade dress which is likely to confuse customers as to the source of the product. *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir. 1989); *Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126 (1982). The Lanham Act also protects unregistered trade dress. 15 U.S.C.A. § 43(a).[14] To prevail on a trade dress infringement claim, a plaintiff must show that the trade dress qualifies for protection, and has been infringed. *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998), *rev'd on other grounds*, *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351 (5th Cir. 2002); *see also Sno-Wizard Mfg., Inc. v. Eisemann Products Co.*, 791 F.2d 423, 425 (5th Cir. 1986). The first prong of this test focuses on functionality, distinctiveness, and secondary meaning. *Sno-Wizard Mfg.*, 791 F.2d at 425. The second prong involves a

---

[14] Section 1125(a) protects unregistered service marks and trade dress, and provides:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. §1125(a)(1).

balancing test to determine whether a likelihood of confusion exists between the protected trade dress and the allegedly infringing trade dress. *Id.*

To satisfy the first prong and show that the trade dress qualifies for protection, the plaintiff must show that the elements of trade dress are not "functional." *Sno-Wizard Mfg.*, 791 F.2d at 426. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (internal quotation marks omitted). If the product feature is aesthetic rather than utilitarian, it is appropriate to consider whether protecting it from infringement will place competitors at a "significant non-reputation-related disadvantage." *Id.* at 33. The Supreme Court has applied a more rigorous functionality test in product-design cases. In many situations involving trade dress, "there is no prohibition against copying goods and products." *Id.* at 29. "Trade dress protection, however, is not intended to create patent-like rights in innovative aspects of product design. Trade dress protection . . . does not prevent reverse engineering or copying of innovative product design features." *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002) (citation omitted).

If the trade dress elements are not functional, then under normal circumstances the plaintiff must show that they are either distinctive or have acquired secondary meaning. A product design is "distinctive" if it "serves as a symbol of origin." *Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991) (quoting *Sno-Wizard Mfg.*, 791 F.2d at 425). It has acquired "secondary meaning" if it creates a "mental association in buyers'

minds between the alleged mark and a single source of the product." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 (5th Cir. 1999) (citing *Sunbeam Products*, 123 F.3d at 253-54). In cases involving unregistered trade dress, the Supreme Court has ruled that a product's design "is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000). *See also Frank's Casing Crew & Rental Tools, Inc. v. David L. Sipos Vermilion River Tool & Equip. Co.*, No. 05-0261, 2005 WL 1567307 (W.D. La June 28, 2005); *Wolf Designs, Inc. v. Donald McEvoy Ltd., Inc.*, 341 F. Supp. 2d 639, 644 (N.D. Tex. 2004). The Court imposed this more rigorous test for product design cases because it found that a product's design, as opposed to its packaging or labels, is almost never inherently source-identifying:

> Consumers are aware of the reality that, almost invariably, even the most unusual of product designs –such as a cocktail shaker shaped like a penguin – is intended not to identify the source, but to render the product itself more useful or more appealing.

*Wal-Mart Stores*, 529 U.S. at 213.

In a product-design trade dress case, the plaintiff must prove that the product design has acquired secondary meaning by providing empirical evidence of factors such as: (1) the length and manner of use of the mark or trade dress, (2) the volume of sales, (3) the amount and manner of advertising, (4) the nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress. *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (citing Restatement (Third) of Unfair Competition, § 13 cmt e.; *Duraco Prods., Inc. v. Joy Plastic Enters.*, 40 F.3d 1431, 1452 (3rd Cir. 1994); *Zatarains, Inc. v. Oak Grove*

*Smokehouse, Inc.*, 698 F.2d 786, 795 (5th Cir. 1983); 2 J. THOMAS MCCARTHY, MCCARTHY

ON TRADEMARKS AND UNFAIR COMPETITION § 15:30 (4th ed. 2005).  The court must weigh

all the evidence presented to determine whether it demonstrates that consumers "consider the

mark or trade dress to be an indicator of source" and that the "meaning of the mark or trade

dress has been altered in the mind of consumers." *Id.* (citing *Zatarains*, 698 F.2d at 795).

Once the plaintiff has adequately demonstrated that the trade dress warrants

protection, the plaintiff must then show that the allegedly infringing product creates a

"likelihood of confusion" between itself and the protected product, infringing the protected

product's trade dress.  *See Pebble Beach Co.*, 155 F.3d at 536.  In determining whether a

likelihood of confusion exists, courts consider a nonexhaustive list of what that the Fifth

Circuit refers to as "digits of confusion," applicable to both trademark and trade dress

infringements.  The list includes: (1) the type of trademark allegedly infringed, (2) the

similarity between the two marks, (3) the similarity of the products or services, (4) the

identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6)

the defendant's intent, and (7) any evidence of actual confusion.  *Elvis Presley Enters., Inc.*

*v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998).  *See also Chevron Chemical Co. v. Voluntary*

*Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981).   The court must weigh the

"digits" in order to determine "'whether the defendant is passing off his goods . . . as those

of the plaintiff by virtue of substantial similarity between the two, leading to confusion on

the part of potential customers . . . ." *Chevron Chemical*, 659 F.2d at 703 (quoting *Sun-Fun*

*Products, Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 192 (5th Cir. 1981)).

## B.        Analysis

When a plaintiff asserts trade dress based on a combination of elements in a line of different products, courts have required a threshold showing that the plaintiff identifies and consistently uses the specific elements that make up the asserted trade dress. "[A] plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress." *See Yurman Design*, 262 F.3d at 116.  The "appropriate threshold inquiry in a trade dress case [in which the] plaintiff seeks protection for a series or line of products or packaging" is whether the trade dress has a "recognizable and consistent overall look." *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 172 (3d Cir. 2000) (stating that "we will require this more stringent test before the non-functionality / distinctiveness / likelihood of confusion test is applied.").  Berg has identified the combination of the following elements as constituting his distinctive trade dress:

> 1.  if an edge was used, heavy raised half-rounded edges with oversized, tapered beads, often with smaller beads in descending size centered around a larger bead
>
> 2.  vine/leaf scrollwork in layers
>
> 3.  tri-color gold
>
> 5.  black background

(Docket Entry No. 54, p. 1).  Berg's asserted trade dress is sufficiently specific and consistent to determine whether it is protected under the Lanham Act.[15]

---

[15]   At trial, Symons argued that Hugh Weaver created a belt buckle in 1986 that incorporated the elements of the claimed trade dress.  Originality is not an element of trade dress protection. "The trade-mark may be, and generally is, the adoption of something already in existence. . . [A trademark] requires no fancy or imagination, no genius, no laborious thought. It is simply founded on priority of appropriation."  *In re*

*1. Inherently Distinctive*

In support of his protected trade dress claim, Berg produced as evidence advertising, special-interest articles about Berg, two letters from other silversmiths, and the testimony of two consumers of western jewelry. Lorraine Owen, a woman who has been with the Prescott Frontier Days Rodeo for ten years—seven as a chairman and three as a director—and who has been in charge of its contestant and membership awards for three years, testified in her deposition that Berg's was the first work that she saw with a look that included the use of tri-colored gold, flowers, a black background, and scrollwork. She stated that a "Bob Berg" prize belt buckle was considered to be the "Cadillac" of western buckles. Michelle Lilly frequently attends rodeos. She testified that she bought Bob Berg jewelry for its "look," which is well known, and that she is able to identify a piece of Berg's work because of its appearance. Her testimony suffered from the fact that she attributed stones in the middle of flowers to the "Bob Berg look"; Berg testified that this was widespread and was not a distinctive feature of his work.

Berg submitted an article from the 1998 issue of Cowboys & Country, "Bob Berg: Broncs, Buckles, and Mechanical Bulls, How an Aussie bronc-buster now busts out custom belt buckles for a clientele that includes Tanya Tucker, George Strait, Ted Turner and a host

---

*Trade-Mark Cases*, 100 U.S. at 94. Weaver only made one buckle like the one he showed Berg in 1989. The buckle has heavy, rounded edges with tapered oversized beads; uses only two colors of gold; has scrollwork and flowers with stones in them; and has a black background. It is undisputed that Weaver and Berg do not sell jewelry to the same market or produce the same type of work. Weaver does not sell at rodeos or trade shows and gets business by word of mouth. He testified that he is not a competitor of Berg on the rodeo circuit or otherwise. Weaver does not use the beaded edge element in his work or any other "signature" element in his jewelry. He testified that he sells custom-made pieces, that are each unique and that take years to make, for an average of $50,000.00. By contrast, Berg's pieces range from approximately $50 to $4,000, are factory-produced, and sell at rodeos and on the Internet.

of champion cowboys." The article describes Berg's business pursuits in jewelry, clothing, and rodeo equipment. Under the heading "How Berg Beauties Changed an Industry," Berg's jewelry design work is described as follows:

> In less than half a year, one collector of Berg buckles (which start at $1,000) has bought five of them—at prices averaging $2,750. Women collect his individually numbered bracelets, of which only 100 are produced per design. . .
>
> Before Bob Berg's buckles appeared, all rodeo buckles looked pretty much the same—pretty, shiny, but all the same size and shape, they differed only in their inscriptions.
>
> "They were fairly uniform," Berg remembers. "They all had a kind of whitish-silver background with gold overlays. I wanted to make the inscription and the design stand out a bit more."
> . . . .
> His first move was to make buckles in different shapes and sizes and to treat the edges differently. Instead of beads and rope, his edges featured tapered beads and half-rounded gleaming surfaces. His next dramatic departure was backgrounds of velvet black. . . .
>
> Then he started "painting with metal." He was the first to use copper and tricolor gold, and the first to go 3-dimensional. He solders layers of different metals on top of each other, literally building a design in three dimensions.

(Docket Entry No. 22, Ex. 2).

Berg submitted a letter dated September 27, 2004 from James Stegman, the President of Comstock Heritage, a silversmith company. The letter stated in part as follows:

> I have not seen any other companies offer this style of background on trophy buckles except for Bob Berg Buckles. I seem to remember seeing that background from Bob Berg sometime in the early 1990's . . . . I remember seeing this as a

distinct look, especially since it was done on Sterling Silver and Sterling Overlay. . . . Our customers never have purchased that much of that look in precious or semi-precious metals.

Since we seem to have been the only other company offering black enamel, I would say that Bob Berg buckles has made that a signature look.  Although it is possible for other companies to use the enamel in the background, it takes years to perfect.  Not only is it difficult to get consistent, but finding the right points and removal chemicals represents years of trial and error.

(P. Ex. 97).

The evidence shows that Berg's jewelry and buckle designs use design elements that are common motifs in western  jewelry: a raised beaded edge, leaf-and-vine scrollwork designs, flower designs, and metallic colors are all used in the highly-stylized look of western jewelry. *See Big Island Candies*, 269 F. Supp. 2d at 1248–49 ("[T]he BIC Cookie design consists entirely of design elements that are so basic that the primary purpose of their combination cannot be source identification.  The most basic cookie shapes. . . do not become Protectible just because cookies may be baked in the shape of pineapples, giraffes, or people.").  The evidence at trial showed that western jewelry and belt buckles use highly stylized elements.   There are a limited number of configurations or design elements architecturally compatible with the jewelry or buckle structures on which they are placed and stylistically compatible with the "western" look.  The same elements are often present.  The vine-and-leaf scrollwork, flower design, and metallic color occupy a "generic emblem" status.  A stylized edge is common in western jewelry; Symons explained at trial that a "rope edge" or "berry edge" is considered the industry standard.   Weaver testified that

Mark Grain, an engraver from Reno who worked with Berg before he moved to the United States, was the first to use the heavy or exaggerated half-rounded beads. Weaver also testified that others in the belt buckle and jewelry business use black backgrounds, rounded beads, and tri-color gold, in varying combinations.

The evidence shows that most of the features of the asserted trade dress are design elements that are now used by many producers of western jewelry. The credible evidence showed that vine-and-leaf scrollwork was an "industry standard"; that a number of buckle designers used round graduated beads on edges; that at least two-color gold is frequently used; and that a black background is often used in western buckle and jewelry designs. Although Berg may have been among the first to use or combine some of these elements, the credible testimony by Hugh Weaver and Symons showed that the designs of western jewelry and buckles have evolved to make these elements widely used. The evidence showed that others besides Berg use the combinations of the same design elements that he asserts are inherently distinctive or have acquired secondary meaning. Berg has failed to present evidence showing that consumers associate the development of his designs primarily as an indication of source, as opposed to an indication of the desirability or artistic quality of the product itself. Given the highly stylized nature of western jewelry, Berg's use of the design features does not establish that consumers primarily link these features with the source of the jewelry. "[W]hen consumers value the feature for its own sake rather than as a badge of origin, it may be copied freely." *Bretford Mfg.*, 419 F.3d 576 at *2.

Berg did not present survey evidence, which the Fifth Circuit has recognized as the "most direct and persuasive way of establishing secondary meaning." *Sno-Wizard Mfg.*, 791 F.2d at 427 (quoting *Zatarains*, 698 F.2d at 795). Nor did Berg show extensive advertising or high sales volume. The evidence of advertising that he submitted at trial consisted primarily of promotional materials that Symons prepared during the marriage that describe the "quality and innovative design work" of Berg's buckles. In the print advertisements that contain pictures of some of the jewelry designs, the asserted trade dress is not described or emphasized. The words "Distinct, Innovative, Exceptional" appear in a corner, without any explanation. (P. Ex. 14). Copies of letters sent to rodeo committees describe the jewelry and buckles as featuring "three different colors of gold (rose, yellow and green), beaded edges and black background (if desired)." (P. Ex. 34). As described in the magazine articles that Berg submitted, he adapted generic design elements to create a "[r]ich, bold, classy look." (Docket Entry No. 22, Ex. 2). This evidence does not, however, establish that the "look" is so distinctive that it is uniquely associated with Berg, or has acquired secondary meaning as a "Bob Berg" design piece.

With respect to sales volume, Berg did not produce records showing high sales volume. Symons testified that the business made at least $1.3 million in sales in 1999. During the preliminary injunction hearing, the receiver testified that Berg turned in $15,000 to $20,000 a month during the receivership. (P. Ex. 26, p. 21). Although Berg has produced sales records from some prestigious contracts with the Texas High School Rodeo Association, and some celebrity customers, such as Tanya Tucker and Troy Aikman,

isolated sales to prestigious customers are not significant proof of distinctiveness or secondary meaning.

Symons testified that the "Bob Berg" look became very popular and that his work was well-known in the rodeo jewelry industry. Symons testified that after the divorce, she wanted to continue to sell jewelry with the "Bob Berg" look and that she intended to produce pieces with the same design elements. Courts have recognized that "evidence of intentional copying shows the strong secondary meaning of [a product] because 'there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991). However, courts also recognize that evidence of a defendant's intent to copy is more relevant to the infringement analysis than the protection analysis. *Sno-Wizard Mfg.*, 791 F.2d 423; *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). In this case, the parties' divorce weakens the probative value of "copying" as evidence of distinctiveness and secondary meaning. Symons testified that she continued to produce jewelry that looked like the pieces Bob Berg designed because she thought she had the legal right to do so and because it was the only business she had known.

Based on the evidence presented at trial and the nature of the product and market, Berg has failed to show that the asserted trade dress has inherent distinctiveness or has acquired secondary meaning. The Supreme Court has cautioned against misuse or overextension of trade dress, given that "product design almost invariably serves purposes other than source identification." *TrafFix Devices*, 532 U.S. at 29 (quoting *Wal-Mart Stores*,

529 U.S. at 213). A product's design, unlike its packaging, is inextricably tied to the nature of the product or its appeal to consumers, i.e. the product itself as opposed to its source. In *Wal-Mart*, the Supreme Court stated that "as in the case of color," a product's design cannot be inherently distinctive because "consumer predisposition to equate the feature with the source does not exist." 59 U.S. at 212–13. Unique combinations that comprise the product itself do not have the benefit of consumer predisposition to treat design features as an indication of source. "Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness." *Wal-Mart,* 529 U.S. at 213. Courts have noted that if trade dress protection was extended on the basis of a period of exclusive use and advertising expenditures, every introducer of a new design would assert trade dress protection. *See Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576 (7th Cir. 2005) (affirming judgment against plaintiff who sold tables to buyers who knew the source of the goods; the fact that it was the only maker of the tables for eight years and spent more than $4 million to promote sales did not create a distinctive trade dress).

In this case, Berg secured copyright protection for the aesthetic features that he also asserts as trade dress. "The availability of [copyright protection] greatly reduces any harm to the producer that might ensue" from limiting trademark protection to product design features that have acquired secondary meaning. *Wal-Mart Stores*, 529 U.S. at 214; *see also Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1446 (3d Cir. 1994) ("[I]t is

48

not the purpose of unfair competition law, under the guise of either consumer protection or the protection of business good will, to implement a policy of encouraging innovative designs by protecting them once designed. . . . Those issues are the province of copyright and patent laws."); *United States v. Giles*, 213 F.3d 1247, 1252 (10th Cir. 2000) ("A copyright is intended to protect the owner's right in an abstract design or other creative product.").

The nature of the product and the particular market in which the asserted trade dress operates require stronger evidence of distinctiveness or secondary meaning than Berg presented. The asserted trade dress consists of design elements that are commonly used in the western jewelry industry. Although "generic" usually describes a bar to trademark status of a word, a number of courts have recognized the same concept in trade dress to describe commonplace themes and styles. A design may be generic if it is so common in the industry that it is incapable of serving to identify any one particular source. Although "[a] unique combination of elements may make a dress distinctive, [] 'the fact that a trade dress is composed entirely of commonly used or functional elements might suggest that the dress should be regarded as unprotectible [sic] or 'generic,' to avoid tying up a product or marketing idea." *Yurman Design*, 262 F.3d at 118. "In the context of product design, a 'generic' design can be understood as a design dictated by the product itself, or a design that is one of a small number of available alternatives." *Hanig & Co., Inc. v. Fisher & Co., Inc.*, No. 92C1779, 1994 WL 97758 *4 (N.D. Ill., Mar.24, 1994). A design may be generic if it is a basic or necessary format or "so common in the industry or in the marketplace that it

cannot be said to identify any particular source." *Big Island Candies, Inc. v. Cookie Corner*, 269 F. Supp.2d 1236 (D. Haw. 2003) (concluding that asserted trade dress for cookie design was "nothing more than a nondistinctive combination of a few basic, common design elements . . . ., which naturally result from a basic and common method of making cookies."); *compare Storck USA, L.P. v. Farley Candy Co., Inc.*, 797 F. Supp. 1399, 1406 (N.D. Ill. 1992) ("Isolated or piecemeal third party uses of various elements of the [plaintiff's] trade dress . . . do not detract from the distinctiveness of the overall impression conveyed by the combination of those elements . . . ."). Common use within an industry weakens the ability of the design or configuration to indicate a particular source. Distinctive trade dress is more difficult to show in markets that are themselves characterized by a well-defined "look" or genre. *San Francisco Mercantile Co. v Beeba's Creations, Inc.*, 704 F. Supp. 1005 (C.D. Cal 1988) (trade dress for Victorian night gowns was not protected when individual elements making up the "look"—lace, cotton fabric, buttons, and other features—were essential to "Victorian" look); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1048 (9th Cir. 1998) (grape-leaf designs on a bottle of wine were "generic emblems" in the wine industry that had "lost their power to differentiate brand"); *cf. Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1262 (Fed. Cir. 1995) (granting trade dress protection to furniture line featuring "a nautical look, with wide slats, scooped seat boards and arms, rounded edges, notched and curved legs, and angled backrests").

Based on the evidence presented at trial and the nature and market of the asserted trade dress, this court concludes that Berg has failed to carry his burden of proof in asserting

trade dress protection. The evidence fails to demonstrate persuasively that the "Bob Berg Elements" are inherently distinctive or have acquired secondary meaning in the minds of consumers.

### 2. *Functionality*

If a product design feature is functional, it cannot be protected trade dress. *Ritter GMBH*, 289 F.3d at 355. There are two tests for determining functionality for purposes of a trade dress claim. Under the "traditional" test, a product feature is functional if it is essential to the use or purpose or affects the cost or quality of the product. Under the second test, which is commonly referred to as the "competitive necessity test" and generally applies to aesthetic features, the standard is whether the exclusive use of the product feature would put competitors at a significant non-reputation related disadvantage. *TrafFix*, 532 U.S. at 32 (quoting *Qualitex,* 514 U.S. at 165). In the absence of alternative designs, the feature is functional and unsuitable for protection. *Abercrombie*, 280 F.3d at 642.

In this case, the individual elements of the trade dress are not "essential" to the use or purpose of western jewelry and do not affect the cost or quality of the jewelry. The design elements serve an ornamental purpose. Because the asserted trade dress consists of a combination of aesthetic features, the issue is aesthetic functionality under the "competitive necessity" standard. The standard is whether "extending trade dress protection to the plaintiff's designs would prevent the defendant[] from creating alternative jewelry designs that would compete in the marketplace." *See Yurman Design, Inc. v. Golden Treasure Imps., Inc*., 275 F. Supp.2d 506, 511 (S.D.N.Y.2003).

In *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 916 F.2d 76 (2d Cir.1990), the plaintiff sought protection under the trademark laws for a basic style and pattern of silverware known as the "baroque" decorative style. *Id*. at 77–78. The court held that the claims were barred by the doctrine of functionality because plaintiff sought "trademark protection, not for a precise expression of a decorative style, but for basic elements of a style that is part of the public domain." *Id*. at 81. The Second Circuit explained that there was "no distinction between a claim to exclude all others from use on silverware of basic elements of a decorative style and claims to generic names, basic colors or designs important to a product's utility." *Id.* This exclusion would significantly hinder other competitors from competing successfully by limiting adequate available alternative designs. *Id.* The court's reasoning in *Wallace* applies to such design elements as the vine-and-leaf design, a raised beaded edge, metallic colors, and the use of flowers with colored stones in the middle that are included in scrollwork, the asserted trade dress in this case.

Berg's trade dress relies heavily on his use of a black background and tri-gold colors. Courts have recognized functionality concerns in trade dress claims that rely on basic colors. Black has been recognized as an important design element because of its aesthetic ability to match well with other colors. *See, e.g.*, *Qualitex Co. v. Jacobson Prods. Co. Inc.*, 514 U.S. 159, 166 (1995) (discussing functionality with respect to colors in terms of "depletion" of acceptable alternatives); *Brunswick Corp. v. British Seagull Ltd.*, 35 F.3d 1527 (Fed. Cir. 1994) (black color on outboard motors was functional because it is compatible with a wide variety of boat colors and makes the motor appear smaller). In

*Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337 (7th Cir. 1998), the plaintiff asserted trade dress protection for gold-gilded pages used in its cookbooks. The court rejected the plaintiff's argument that the allegedly infringing cookbook could have used a color other gold, explaining that because "[g]old connotes opulence" and "is a natural color to use on a fancy cookbook," a "different color on [plaintiff's] page ends would have a better claim to be a source signifier; compare a blue container of orange juice with an orange one." *Id.* at 342. In the context of western jewelry design, the range of available colors for the background and the design elements is limited. Almost all western jewelry uses metallic colors and various shades of gold, silver, and copper for the overlay and scrollwork designs. Black is one of the few nonmetallic colors that is compatible with the general format of western jewelry. Symons testified in the bench trial and in her deposition that it is increasingly used as a background color in western jewelry and buckles. (P. Ex. 146, p. 95).

The record shows that competitive designs incorporate the industry standard elements—vine-and-leaf scrollwork, flowers, and a raised, often beaded, edge—in combination with some of the other elements—a black or silver background and the use of gold metal in different colors. The evidence shows that trade dress protection for combinations of the five design elements would hinder effective market competition. The testimony presented at trial suggests that the trend is to combine and exaggerate the basic color and design elements that are the signature of the western jewelry market. *See Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC*, 369 F.3d 1197, 1204 n.7 (11th Cir. 2004) ("functionality. . . is not to be determined within the broad compass of different but

interchangeable products; the doctrine of functionality is intended to preserve competition within the narrow bounds of each individual product market") (quoting 3 Louis Altman, Callman on Unfair Competition, Trademarks, and Monopolies § 19.7 at 79 (4th ed. 2003) .

Berg has not shown that his jewelry designs and buckle designs have a protected trade dress under section 1125(a) or section 43(a) of the Lanham Act.  He is not entitled to an injunction, preventing Symons from using the design elements identified in producing and selling jewelry and buckles that are not copies of the copyrighted designs.  Berg is not entitled to recover damages for trade dress infringement.

## VII.  The False Advertising Claim

### A.      The Applicable Legal Standards

The false advertising section of the Lanham Act is intended to prevent confusion or mistake regarding the characteristics or qualities of goods or services.   Section 1125(a)(1)(B) states in part:

> Any person who, on or in connection with any goods or services. . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. 1125(a)(1)(B).  A plaintiff must establish five elements to make out a prima facie case of false advertising under Section 43(a) of the Lanham Act:

> (1) A false or misleading statement of fact about a product in commercial advertising;
> (2) Such statement either deceived or had the capacity to deceive a substantial segment of potential consumers;
> (3) The deception was material, in that it is likely to influence the consumer' purchasing decision;
> (4) The product is in interstate commerce; and
> (5) The plaintiff has been or is likely to be injured as a result of the statement at issue.

*Pizza Hut, Inc. v. Papa John's Int'l, Inc*., 227 F.3d 489, 495 (5th Cir. 2000). To obtain money damages for false advertising, the plaintiff must first demonstrate that the advertisement was literally false or likely to mislead and confuse customers. *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) (citing *Proctor & Gamble Co. v. Amway Corp*., 242 F.3d 539, 563 (5th Cir. 2001)). If the plaintiff can show that the advertisement is literally false, the plaintiff need not provide evidence of deception. *Id.* (citing *Pizza Hut*, 227 F.3d at 497). If the plaintiff can show only that the statement is misleading or ambiguous, the plaintiff must prove actual deception "through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests." *Id*. A plaintiff may not rely on the judge or the jury to determine, based solely on his or her intuitive reaction, whether the advertisement is deceptive. *Pizza Hut,* 227 F.3d at 495.

A representation constitutes a "commercial advertising or promotion" under section 43(a)(1)(B) if it is: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public to

constitute "advertising" or "promotion" within that industry. It is undisputed that Symons

is in competition with Berg. Hy O Silver and Bob Berg Buckles sell to the same consumers

through the same channels of commerce. *See Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d

1379, 1383 (5th Cir. 1996).

**B.     Analysis**

Berg claims that Symons falsely advertised in a November 1, 1999 letter that Bob

Berg Buckles was out of business; advertised Hy O Silver as the successor to Bob Berg

Buckles; and wrongfully assumed the toll-free business numbers that had been used for Bob

Berg Buckles and Silverdales before the divorce. On November 1, 1999, Symons sent a

letter to customers of Bob Berg Buckles that states in part as follows:

> I am sending this letter to you as a form of introduction. My name is
> Joanne Symons-Berg, I have been in the buckle and jewelry design
> business for 16 years. Formally I had been associated with Bob Berg
> Buckles. My new company is **Hy O Silver** of Bandera, Texas. . . .
>
> The product offered by Bob Berg Buckles for individuals, rodeo
> committees, youth groups, private ropings, etc. will remain the same.
> The quality of the product workmanship will not change and as Hy O
> Silver we will be adding new items to the line.
>
> We at Hy O Silver have been at this location for 5 years and the staff of
> the past 2 years is remaining the same! We know that you have ordered
> from us in the past and would like to offer you a 25% discount on a new
> order from you if delivered after January 31 and a 10% discount on any
> committee order.
>
> I am aware that it is difficult for all of when changes occur and we
> would like to assure you that only the name has changed. . . .

(P. Ex. 38). Berg argues that the letter led readers to believe that Bob Berg Buckles was

out of business or going out of business. Symons claims that she just wanted to introduce

Hy O Silver as a new company. She testified that she did not want him to go out of business because he was ordered to pay her child support each month. She claims that it was not her intent to suggest that Berg was going out of business. In hindsight, she wished she had hired a lawyer to help her draft the letter.

The record contains a notarized letter from Jill Foster dated November 20, 2000. Foster works for a western industry publication and worked with Berg to advertise his jewelry in the Dallas area and at different shows. That letter states:

> When I was at the 2000 San Antonio Stock Show there was a trade booth selling Bob Berg's Jewelry but it was his ex-wife's new company selling these items. While working at the 1999 National Finals Rodeo I met three different people that were wearing Bob Berg items. I commented on their pieces and showed them my own personal buckle. Each of them stated they were disappointed that Bob was no longer in the business. I assured them he was indeed still making jewelry. They told me they had received a letter informing them that Bob Berg Silverdales no longer existed.

(P. Ex. 63).

There are different types of false advertising that may be actionable under the Lanham Act: statements that are actually false, statements that are ambiguous, and statements that are true-but-misleading. *Pizza Hut*, 227 at 495. As to ambiguous or true-but-misleading statements, a plaintiff must present evidence of actual deception. *Id.* at 497. "Plaintiffs attempting to prove actual deception have to produce evidence of actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled by the advertisements." *Id.* (citing *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987)). Symons's letter was,

at a minimum, confusing. But Berg has not shown that a significant number of people bought buckles from Hy O Silver when they would have bought them from Bob Berg Buckles if the letter had not been sent. In addition, Berg has not proven the fifth element, that he was injured as a result of the letter. *See id.* The letters from customers expressing confusion do not show that he lost business; rather, it shows that those people wanted to continue to do business with Bob Berg Buckles. There is no evidence that Berg lost any major customers, such as the Texas High School Rodeo Association, because of the letter. In November 2000, a state court enjoined Symons from selling jewelry as Bob Berg Buckles and instructed her to choose and proof advertising language carefully. It is undisputed that Lynn Liss, who worked for Bob Berg Buckles prior to the parties' divorce, directed several domain names registered for Bob Berg Buckles and Silverdale to the Hy O Silver website after the divorce when she worked for Hy O Silver. (P. Ex. 66). Symons testified that Liss redirected the web sites without her knowledge or instruction. The record also shows that in August 2000, the program for the 2000 Bud Light Texas Team Roping Champion Finals in Fort Worth, Texas described Hy O Silver, the maker of the prize buckles, as "formerly" Bob Berg Buckles. (P. Ex. 57). Symons credibly testified that the omitted "of" was a typographical error made by the entity that created the program.

In November 2000, the web sites had been redirected to the original Bob Berg Buckles and Silverdales addresses. There is no evidence of damages that resulted. This court finds that Symons is not liable for false advertising, in violation of the Lanham Act,

and that Berg has not shown that the sustained damages are a result of the conduct he alleges.

## VIII.   The Tortious Interference Counterclaim

### A.        The Applicable Legal Standards

To show tortious interference the plaintiff must show the following elements:

(1) a reasonable probability of entering into a business relationship;

(2) an independently tortious or unlawful act that prevented the relationship from occurring;

(3) the defendant acted with a conscious desire to prevent the relationship from occurring, or the defendant knew the interference was certain or substantially certain to occur; and

(4) actual harm or damages.

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001).  Justification is an affirmative defense to tortious interference.  The justification defense is based on either the exercise of one's own legal rights or a good-faith claim to a colorable legal right even if that claim proves to be mistaken. *Prudential Ins. Co. of America v. Financial Review Servs., Inc*., 29 S.W.3d 74, 80 (Tex.2000)

### B.        Analysis

Symons contends that Berg has attempted to have her products seized at the United States-Mexico border by the U.S. Customs Service.  He has attempted to have publications withhold Symons's advertisements.  He contacted her supplier and tried to interfere in that relationship.  Symons argues that these bad actions on the part of Berg have harmed her business relationships, but Symons did not produce evidence of diverted business

relationships or damages in the form of lost sales or otherwise. *See Kiepfer v. Beller*, 944 F.2d 1213, 1220 (5th Cir. 1991); *Baker v. Waterford Square Homeowners Ass'n*, No. 00-0354, 2002 WL 1461735 at *5 (July 2, 2002 N.D. Tex.); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). This court denies Symons's tortious interference claim against Berg.

## Conclusions of Law

Symons is liable to Berg for copyright infringement under 17 U.S.C. § 504 as to the forty product designs that Symons stipulates to copying in producing jewelry to sell under the name Hy O Silver. Symons is not liable to Berg for trade dress infringement under 15 U.S.C. §§ 43(a) or 1125(a). Berg has failed to show either inherent distinctiveness or secondary meaning in the combination of certain elements.

Under 17 U.S.C. § 504, this court orders that defendant Joanne Symons d/b/a Hy O Silver pay plaintiff Robert P. Berg d/b/a Bob Berg Buckles d/b/a Silverdales statutory damages in the amount of $2,000 for each of the forty works that Symons stipulated to infringing, for a total of $80,000. This court also finds that plaintiff Robert P. Berg is entitled to receive reasonable costs of court from Joanne Symons, pursuant to 17 U.S.C. § 505. Each party is to bear its own attorneys' fees.

This court enjoins defendant Joanne Symons and her agents, servants, employees, attorneys, and those acting in concert with her from producing or selling jewelry or belt buckles using any design copyrighted by Bob Berg or Bob Berg Buckles. This court further orders Joanne Symons to deliver to Robert P. Berg all copies of molds, dies, and jewelry in

her possession or control no later than **October 28, 2005.**

Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

The parties are to submit a proposed final judgment and order of injunction no later than **October 15, 2005.**

SIGNED on September 30, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge